ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of --                                    )
                                                )
Strategic Technology Institute, Inc.            )        ASBCA No. 61911
                                                )
Under Contract No. N00178-05-D-4580             )

APPEARANCES FOR THE APPELLANT:          James Y. Boland, Esq.
                                        Caleb E. McCallum, Esq.
                                          Venable, LLP
                                          Tysons Corner, VA

APPEARANCES FOR THE GOVERNMENT:         Arthur M. Taylor, Esq.
                                          Chief Trial Attorney
                                        Kara M. Klaas, Esq.
                                          Trial Attorney
                                          Defense Contract Management Agency
                                          Chantilly, VA

OPINION BY ADMINISTRATIVE JUDGE D'ALESSANDRIS

        In April 2008, the Department of the Navy (Navy) awarded a contract to
appellant, Strategic Technology Institute, Inc. (STi), for engineering support and other
services.  The contract was STi's first cost-type contract, and the contract was
administered by the Defense Contract Management Agency (DCMA or government).
Pursuant to the contract, STi was required to submit an Incurred Cost Proposal (ICP)
within six months of the end of its fiscal year, which was the calendar year.  STi
retained accountants to timely prepare its ICPs for the 2008 and 2009 fiscal years, in
2009 and 2010, respectively.

        This appeals turns on the following factual dispute.  STi contends that it timely
submitted the ICPs to the contracting officer.  However, STi has not presented
documentary evidence or testimony from a witness with personal knowledge to
demonstrate that it submitted the documents.  Conversely, the government maintains
logs of incoming mail (both email and hard-copy mail) and finds no record of
submission to the Navy or DCMA.

        Following submission of an ICP, the normal procedure is for the Defense
Contract Audit Agency (DCAA) to audit the ICP, and for the contracting officer to set
final incurred cost rates.  At the time of these events, DCAA monitored ICP
submissions based on the date of the last submission, and would send reminders to
contactors if the government had not received a new ICP within a year of the most

recent submission. However, because this was STi's first cost-type contract, there was no prior submission to trigger this reminder.

The situation remained unchanged until July 2014, with STi apparently of the belief that its 2008 and 2009 ICPs were awaiting audit, and the government apparently unaware that it had not received the 2008 and 2009 ICPs. During that month, DCAA was auditing STi's 2010 ICP, which would have been submitted in June 2011 -- three years earlier. The auditor found reference to 2008 and 2009 costs, and requested from STi copies of its 2009 and earlier ICPs. STi promptly provided the 2008 and 2009 submissions to DCAA. At this point in July 2014, the 2008 ICP had been prepared five years earlier. In August 2014, DCAA internally considered the statute of limitations and concluded that, since it had no record of the ICP having been submitted previously, there was no statute of limitations problem, meaning that they concluded that they had six years from the prior month's submission to bring any claim, rather than a period of less than 11 months, that would apply if DCAA had received the document back in July 2009. DCAA issued its audit report regarding the 2008 and 2009 ICPs in June 2015, just shy of six years from the original due date of the 2008 ICP, and just over a year prior to the expiration of the six year claim deadline for the 2009 ICP. The DCMA contracting officer eventually issued a final decision asserting a government claim in excess of $1.1 million in November 2018, over three years after the audit report was released and over nine years after the 2008 ICP was prepared, but less than four-and-a-half years after DCAA requested the ICPs from STI in July 2014.

On appeal to the Board, STi argues that the government's claim is barred by the six-year statute of limitations. STi contends that it timely submitted the ICPs in July 2009 and July 2010, more than six years before DCMA issued its final decision. Alternatively, STi contends that, even if the Board finds that the ICPs were not submitted until 2014, the government's claim accrued in July 2009 and July 2010, because the government should have known that STi's ICPs were due on those dates. STi has not presented any evidence on the merits of the government's claim and states that it is unable to defend against the government's cost claims due to the passage of time. We hold that the contract required STi to submit its ICPs, and that STi has not established, by a preponderance of the evidence, that it submitted its ICP prior to July 2014. Additionally, we hold that the government did not know and had no reason to know of its claims against STi until it received the 2008 and 2009 ICPs in July 2014. Accordingly, we sustain the government's claim, reject STi's statute of limitation defense and deny the appeals.

I. The Contract

On April 1, 2008, the Navy awarded STi Contract No. N00178-05-D-4580, delivery order no. FG01, a cost-reimbursable contract with a performance period of one year, and four one-year option periods (R4, tab 1 at G-57, 68). The contract required STi to provide engineering, logistics and planning, training, and program management support services for Navy mission systems and aircraft to support mission readiness, including "engineering analysis and assessments; system safety services; logistics support; strategic planning and coordination; training; and program management" (*id.* at G-62). The contract was administered by DCMA (*id.* at G-57). The contract incorporated Federal Acquisition Regulation (FAR) 52.215-2, "AUDIT AND RECORDS – NEGOTIATION (JUN 1999)," which required STi to maintain and make available for government examination "records and other evidence sufficient to reflect properly all costs claimed to have been incurred or anticipated to be incurred directly or indirectly in performance of this contract" (*Id*. at G- 43; FAR 52.215-2(b)). The contract also incorporated FAR 52.242-4, "Certification of Final Indirect Costs," which required STi certify its "proposal to establish or modify final indirect cost rates" (R4, tab 1 at G-44; FAR 52.242-4(a)(1)). The contract additionally incorporated FAR 52.242-3, "PENALTIES FOR UNALLOWABLE COSTS (MAY 2001)" and FAR 52.216-7, the "ALLOWABLE COST AND PAYMENT (DEC 2002)" that required STi to submit an ICP within six months of the end of its fiscal year (R4, tab 1 at G-43-44; FAR 52.216-7(d)(2)(i) ("The Contractor shall submit an adequate final indirect cost rate proposal to the Contracting Officer (or cognizant Federal agency official) and auditor within the 6-month period following the expiration of each of its fiscal years.")).

II. STI's 2008 and 2009 Incurred Cost Proposals

During July 2009 and July 2010, STi did not have in place a system to document the dates upon which it sent records outside of STi, including when it submitted its ICPs to the Government (gov't supp. R4, tab G-13 at G-430-31, 435). In June and July 2009 and 2010, STi's Director of Operations, Mr. Navaneeth Muthu, was responsible for submitting STi's final indirect cost rate proposals for Fiscal Years 2008 and 2009, respectively (app. supp. R4, tab A-29 at A-1031; tab A-31 at A-1101). STi retained an outside accountant, Mr. Madison Lawrence, Jr., a former senior DCAA auditor, of Madlaw Consulting, Inc., to prepare and finalize STi's Fiscal Year 2008 and 2009 final indirect cost rate proposals (app. supp. R4, tab A-30 at A-1096; tab A-31 at A-1101). Mr. Lawrence prepared STi's final indirect cost rate proposal for Fiscal Year 2008 in June and July 2009 and provided the proposal to STi (app. supp. R4, tab A-31 at A-1101; tab A-1 at A-1). Mr. Lawrence prepared STi's final indirect cost rate proposal for Fiscal Year 2009 in April to July 2010 and provided the proposal to STi (app. supp. R4, tabA-31 at A-1101; tab A-2 at A-3-5). In

2009 and 2010, STi also utilized the services of its accountant, Mr. Robert Engel of Miller, Engel & Tierney, who passed away in October 2014 (app. supp. R4, tab A-30 at A-1096). In July 2009 and July 2010, Mr. Muthu directed STi employee Mr. Anil Augustin to load STi's final indirect cost rate proposals for Fiscal Years 2008 and 2009, respectively, onto CDs for submission to the government (R4, tab A-31 at A-1101-02).

STi contends that, on July 2, 2009 and July 2, 2010, Mr. Muthu or Mr. Augustin mailed STi's final indirect cost rate proposals for Fiscal Years 2008 and 2009, respectively, to DCAA's Central Maryland Branch Office via UPS or FedEx (app. supp. R4, tab A-31 at A-1101-02; tab A-30 at A-1097; tab A-3 at A-00009-11). Mr. Muthu was terminated from STi on November 22, 2017 (app. supp. R4, tab A-30 at A-1098; tab A-31 at A-1102). Mr. Augustin was terminated from STi on January 5, 2018 (app. supp. R4, tab A-31 at A-1102). STi submitted an affidavit from President Rakesh Chopra stating that he remembers that "Mr. Muthu had [the ICPs] mailed to the Defense Contract Audit Agency;" but Mr. Chopra later states in his declaration that he "do[es] not have direct knowledge of the actual submissions . . ." (app. supp. R4, tab A-30 at A-1097-98). STi also submitted a declaration from STi's Office Manager, Ms. Kamila Horakova Dudley, in which she states that she was not responsible for submitting the ICP's but remembers that the ICPs "were submitted by Mr. Muthu, via UPS or FedEx" in early July 2009 and July 2010 (app. supp. R4, tab A-31 at A1101-02). However, Ms. Dudley's recollections in her declaration are more detailed than her testimony as a Rule 30(b)(6) witness, when she testified only that she saw an envelope containing what she believed was the disk containing the FY 2008 ICP, but that she did not see it mailed and that she did not recall the mailing of the FY 2009 ICP (gov't supp. R4, tab G-13 at G-453-54).

In contrast to STi's lack of an outgoing mail log, the relevant government agencies maintained systems for logging incoming submissions. DCMA uses an electronic storage system called the Integrated Workflow Management System (IWMS), in which DCMA uploads contractor-submitted ICPs, whether received in electronic format or hard copy (gov't supp. R4, tab G-9 at G-316-17). Similarly, DCAA logs all electronic and hard copy files that it receives into the DCAA Management System (DMIS); all electronic and hard copy files DCAA receives are logged and stored in this manner (gov't supp. R4, tab G-11 at G-357-58; tab G-12 at G-412). DCAA, DCMA, and the Navy have no record of receiving STi's FYs 2008 and 2009 ICPs prior to July 11, 2014 (gov't supp. R4, tab G-8 at G-307; tab G-10 at G-331-35; tab G-11 at G-362-64, 367, 381-82; tab G-12 at G-395-96, 399-00; app. supp. R4, tab A-22 at A-225). While DCMA has no record of receiving the ICPs, this statement is somewhat weakened by its admission that it has no record of who was assigned as the DCMA Administrative Contracting Officer (ACO) in June 2009 and June 2010 (app. supp. R4, tab A-22 at A-223). Based on the totality of the evidence before us, we find that the government has established by preponderant evidence that it did not receive STi's 2008 and 2009 incurred cost submissions until July 11, 2014 (discussed below). We additionally make a finding of fact that STi has not established

4

by a preponderance of the evidence that it submitted its 2008 and 2009 Incurred Cost Submissions on or about July 2, 2009 and July 2, 2010.

### III. DCAA's Audit of STi's 2008 and 2009 Incurred Cost Submissions

The record is devoid of communications between the government and STi regarding STi's ICPs between the due dates for the 2008 and 2009 ICPs, and July 2014. In July of 2014, during DCAA's audit of STi's FYs 2011 and 2012 ICPs, DCAA noticed that STi identified prior year costs but DCAA had no record of STi's ICPs for previous fiscal years (gov't supp. R4, tab G-10 at G-331-32; tab G-11 at G 366-67, 373-74, 376-79; app. supp. R4, tab A-4 at A-12-13). Following the government's requests for STi's prior fiscal year(s) ICPs, on July 11, 2014, STi provided to the government its FYs 2008 and 2009 ICPs (app. supp. R4, tab A4 at A- 12-13). Following a series of exchanges with DCAA, on September 30, 2014, STi submitted revised FYs 2008 and 2009 ICPs to the government (app. supp. R4, tab A-5 at A16; tab A-10 at A-42-51). On October 31, 2014, DCAA notified STi it was beginning the audit of STi's FYs 2008 and 2009 ICPs (app. supp. R4, tab A-12 at A-54).

On August 13, 2014, DCAA deemed STi's Fiscal Years 2008 and 2009 final indirect cost rate proposals to be high risk "[d]ue to the lack of experience with this contractor, as well as missing submissions" and determined that a multi-year audit would be performed (app. supp. R4, tab A-6 at A-23; tab A-7 at A-31; tab A-28 at A-958-66). On August 21, 2014, Mr. Mitchell emailed Mr. Steven Li, DCAA Auditor, assigning Mr. Li the audit of STi's Fiscal Years 2008 and 2009 final indirect cost rate proposals and stating that STi "provided us with FY 2008 and 2009 last month, including signed Schedule N's[1] dated this August (so we don't have to worry about statute of limitations issues)" and that "[b]ased on the fact that they did not supply us with these submissions and that we hardly have any experience with this contractor, we are considering the FY 2008-09 submissions high risk" (App. supp. R4, tab A-8 at A-33). On September 8, 2014, STi was contacted for the first time by Mr. Li regarding an audit of STi's Fiscal Years 2008 and 2009 final indirect cost rate proposals (app. supp. R4, tab A-10 at A-51; tab A-31 at A-1103). On November 12, 2014, Mr. Ron Bakaysa, DCAA Supervisory Auditor, emailed Mr. Li asking Mr. Li to check when DCAA received STi's final indirect cost proposals because Mr. Bakaysa "want[ed] to make sure there are no Statute of Limitations issues for these older years" (app. supp. R4, tab A-13 at A-56-57). On November 12, 2014, Mr. Li responded to Mr. Bakaysa, stating that DCAA received the auditable versions of the final indirect cost rate proposals on September 30, 2014, to

---

[1] The individual signing Schedule N certifies that they have reviewed the proposal and to the best of their knowledge, the claimed costs are allowable and that the proposal does not contain any unallowable costs. *See* FAR 52.242-4(c).

5

which Mr. Bakaysa responded "No [statute of limitations] issues for this one, that is for sure" (*id*. at A-56).

On June 26, 2015, DCAA issued Audit Report Nos. 6221-2008M10100086 and 6221-2009M10100121, that questioned various direct and indirect costs; adjusted indirect rates; and identified that STi billed to the government expressly unallowable costs subject to penalty and interest (R4, tab 8 at G112-63). On June 9, 2016, DCMA emailed STi indicating that DCMA had developed its position for settlement of STi's FY 2008 and 2009 direct and indirect costs and that DCMA was seeking $368,860 in reimbursement for direct costs, penalties, and interest, and also including spreadsheets indicating that DCAA was questioning indirect costs (app. supp. R4, tab A-16 at A-128-34).

## IV. The DCMA Contracting Officer's Final Decision

On November 30, 2018, DCMA issued a final decision unilaterally establishing rates and demanding payment in the amount of $1,107,788, including $117,245 in penalties and interest (R4, tab 16 at G-236). The final decision disallowed a variety of costs, re-characterized certain claimed direct costs as indirect costs, and vice-versa, and unilaterally determined certain overhead rates, resulting in multiple offsetting increases and decreases. In addition, the final decision asserted penalties and interest on unallowable costs. Although STi does not dispute any specific costs, the final decision is a government claim, and the government has the burden of establishing that the costs were not allowable. For simplicity, we have grouped similar costs together.

### A. Disallowed Direct Costs

The final decision disallowed $7,227 in direct costs in FY 2008 and $240,666 in direct costs in FY 2009; however most of the disallowance in FY 2009 was labor that was reclassified as indirect labor (R4, tab 16 at G-224-26). The final decision disallowed a total of $247,893 in direct costs (*id.* at G-224).

### I. Travel

The final decision disallowed $5,527 in FY 2008 direct travel costs per FAR 31.201-2(d) because STi failed to provide supporting documentation (R4, tab 16 at G-225; tab 8 at G-148-50; gov't supp. R4, tab G-15 at G-929, 937-38, 941-44). The final decision similarly disallowed $3,930 in FY 2009 direct travel costs pursuant to FAR 31.201-2(d) representing five direct travel transactions by the same employee, in the amounts of $1,000, $1,000, $1,000, $750, and $180, that lacked any evidence of a business purpose (R4, tab 16 at G-226; tab 8 at G-155-56; gov't supp. R4, tab G-15 at G-1148).

The final decision additionally disallowed $500 in FY 2008 direct travel costs because the contracting officer determined that this cost was actually a referral bonus incorrectly recorded as a direct travel expense. Because this cost was not associated with a cost objective under the contract, the final decision re-allocated the $500 cost as an indirect cost. (R4, tab 16 at G-225, 228) STi classified similar bonus costs in its indirect pools (R4, tab 8 at G-148-50; gov't supp. R4, tab G-15 at G-937).

The final decision also disallowed $216 in FY 2009 direct travel costs for optional rental car loss damage waiver insurance that the contracting officer determined was an unreasonable cost per FAR 31.201-2(a)(1) and 31.201-3 because "this amount is [in] excess of what such a prudent person would incur" (R4, tab 16 at G-226, tab 8 at G-155-56). DCAA reviewed STi's other rental car expenses and found that STi did not ordinarily charge this optional insurance (R4, tab 8 at 156; gov't supp. R4, tab G-15 at 1148). The final decision disallowed an additional $383 in FY 2009 direct travel costs that were in excess of the applicable *per diem* rates. The final decision found that these costs violated FAR 31.205-46, Travel costs, which provides that "costs incurred for lodging, meals, and incidental expenses . . . shall be considered to be reasonable and allowable only to the extent that they do not exceed on a daily basis the maximum per diem rates in effect at the time of travel . . . ." (R4, tab 16 at G-226-27; FAR 31.205-46(a)(2)) The questioned costs included claimed lodging costs in excess of the maximum GSA-published per diem rates; Meals and Incidentals (M&I) costs during a travel period in which no lodging was incurred and without support or an explanation; non-business expenses; and claimed tip amounts which are already included in the M&I daily *per diem* rate while on travel status (R4, tab 8 at G-155-56; gov't supp. R4, tab G-15 at G-1148).

II. Consultant Costs

The final decision disallowed $1,200 in FY 2008 direct costs because the costs were for holiday leave paid to a consultant who was not an employee of STi (R4, tab 16 at G-225). DCAA reviewed "applicable supporting documentation, including consultant/vendor invoices, consulting agreements, check copy, bank statements, and Government correspondence . . ." (R4, tab 8 at G-151). STi paid a consultant $1,200 for holiday leave (gov't supp. R4, tab G-15 at G-929-31, 1144). That consultant became an STi employee in June 2008 (gov't supp. R4, tab G-15 at G-931). At the time STi paid him holiday leave in January and February of 2008, he still served as an outside consultant ineligible for paid leave from STi because he did not render services during this period as required for payment of consultant costs. *See* FAR 31.205-33(f), FAR 31.201-4.

The final decision disallowed $65,875 in FY 2009 direct labor costs and reallocated the costs as allowable Other Direct Costs because the costs relate to a consultant rather than an employee of STi (R4, tab 16 at G-226-27, 230). These costs

7

relate to payments made to Mr. Todd Skipper, Skipper Associates, for outside consultant services (gov't supp. R4, tab G-15 at G-860, 863; R4, tab 8 at G-152-53).

III. Reallocated Direct Labor Costs

The final decision disallowed several categories of direct labor at STi's Rockville facility that should have been properly classified as indirect costs (R4, tab 16 at G-226). FAR 31.201-4, DETERMINING ALLOCABILITY (APR 1984) states that:

> A cost is allocable if it is assignable or chargeable to one or more cost objectives on the basis of relative benefits received or other equitable relationship. Subject to the foregoing, a cost is allocable to a Government contract if it -
>
> (a) Is incurred specifically for the contract;
>
> (b) Benefits both the contract and other work, and can be distributed to them in reasonable proportion to the benefits received; or
>
> (c) Is necessary to the overall operation of the business, although a direct relationship to any particular cost objective cannot be shown.

The final decision reallocated $58,309 in FY 2009 Rockville Direct Labor costs to Overhead for Employee no. 6 because STi charged 100% of this employee's time as a direct labor cost; however, "the executive recorded a portion of this time on his timesheets as Overhead labor" (R4, tab 16 at G-226-30). DCAA reviewed the employee's timesheets and identified 640 hours, equaling $58,309 in charged direct labor, recorded to overhead (R4, tab 8 at G-153-54; gov't supp. R4, tab G-15 at G-925-27, 1077-1130). The disputed amount, $58,309 was reallocated to overhead per FAR 31.201-4.

The final decision similarly reallocated $67,121 in FY 2009 Rockville Direct Labor costs to G&A for STi's President, Rakesh Chopra. STi charged 100% of Mr. Chopra's time as a direct labor cost; however, the contracting officer determined that "an executive normally spends some part of his/her time performing duties to manage the company . . ." and noted that in FY 2008, STi charged 20% of the president's time as indirect labor. (R4, tab 16 at G-226; *see also* tab 8 at G-142; gov't supp. R4, tab G-15 at G-928, 1021-74)) The Audit Report identified that, "[a]ccording to the contractor's representative, this employee spent many hours . . . performing the G&A functions" (R4, tab 8 at G-155). The final decision applied the same 20% factor

8

that STi reported for FY 2008 to reallocate $67,121 (20% of Mr. Chopra's claimed salary) for FY 2009 (*id*. at G-153-54). The final decision also determined that $34,620 in claimed Rockville direct labor that could not be reconciled was actually Norfolk direct labor and adjusted the Rockville and Norfolk direct labor accounts accordingly (R4, tab 16 at 226-27).

IV. Vendor Costs

The final decision disallowed $39,227 in costs per FAR 31.201-2(d) relating to a vendor for which STi failed to provide supporting documentation per FAR 31.201-2(d) (R4, tab 16 at G-227). This is the total of three vendor invoices for which STi either provided only a bank statement with no other details or STi failed to provide any support for the cost (R4, tab 8 at G-156-57; gov't supp. R4, tab G-15 at G-1149).

V. Subcontract G&A Costs

For FY 2009, the final decision disallowed $71,480 in claimed direct costs because the contract limited the G&A rate mark-up on subcontract costs to 8%, but STi claimed its full G&A rate of 15.07% (R4, tab 16 at G-225, 227, tab 8 at G-158-59). STi's contract, clause H.10(C), Maximum Pass Through Rates – Applicable to all Task Orders, provides that "the maximum pass-through rate that shall be charged against any and all line items under this contract shall not exceed 8%" (R4, tab 1 at G- 34). STi applied its full 15.07% proposed G&A rate on the proposed subcontractor costs (R4, tab 8 at G-158-59). The difference between the 15.07% rate and the contractual maximum pass through rate of 8% results in an unallowable amount of $71,480 (*id*. at G-159; compl., ex. C at 14-15).

We find, based on a review of the record, that each disallowance referenced above is supported by preponderant evidence.

B. Disallowed Indirect Costs

The final decision disallowed $107,832[2] in FY 2008 overhead pool costs, $21,298 in FY 2008 G&A pool costs, and also disallowed $69,758 from the G&A base against which STi's overhead rate is calculated (R4, tab 16 at G-228). Based on these questioned costs, the final decision unilaterally determined STi's 2008 overhead rate to be 78.94%, and its G&A rate to be 16.20% (*id*. at G-227). For FY 2009, the final decision disallowed $73,758 in claimed costs in the overhead Rockville pool,

_____

[2] The audit report questioned $108,266 in overhead pool costs (R4, tab 8 at G-124). Adding the $500 referral bonus, disallowed as a direct cost above, should result in a total questioned cost of $107,766, rather than the $107,832 questioned in the final decision. The difference is *de minimis*.

9

increased the overhead Norfolk pool by $19,313 and increased the G&A pool by $61,410 (*id.* at G-229). The final decision disallowed $145,297 from the intermediate fringe benefit base, $225,925 from the overhead Rockville base, increased the overhead Norfolk base by $34,620, and disallowed $94,530 from the G&A base (*id.*). As a result of these adjustments, the final decision unilaterally determined STi's FY 2009 indirect cost rates to be: fringe, 23.40%; overhead Rockville, 63.29%; overhead Norfolk 38.94%; G&A 16.19% (*id.* at G-227). Notably, as a result of the disallowed amounts in the rate bases (the denominator in calculating the rate) STi's FY 2009 indirect cost rates each increased (*id.* at G-229). The net result of all the increases, decreases, and revisions to indirect cost rates is an overbilling of $742,650 (*id.* at G-224, 236 [$990,543 total overbill - $247,893 disallowed direct costs]).

I. Disallowed Depreciation Expenses

The final decision disallowed certain depreciation costs that STi claimed in its ICPs for FYs 2008 and 2009 (R4, tab 16 at G-228, 230-31). The final decision disallowed $50,544 in FY 2008 and $754 in FY 2009 for claimed depreciation on furniture and the deck for a guest house (*id.* at G-228, 230; gov't supp. R4, tab G-15 at G-1008-13). In negotiations, STi admitted that the guest house, itself, was an unallowable entertainment cost and voluntarily deleted the guest house costs from its ICP. However, STi failed to remove the depreciation costs associated with the guest house. (R4, tab 8 at G-125; tab 10 at G-172) Per FAR 31.205-14, ENTERTAINMENT COSTS (OCT 1995), "[c]osts of amusement, diversions, social activities, and any directly associated costs . . . are unallowable." In addition, FAR 31.201-6(a), ACCOUNTING FOR UNALLOWABLE COSTS (NOV 2005), provides that a "directly associated cost . . . generated solely as a result of incurring another cost, and that would not have been incurred had the other cost not been incurred" is also unallowable. STi previously agreed that these depreciation costs are unallowable (R4, tab 10 at G-172).

The final decision disallowed $1,686 in both FY 2008 and FY 2009 in depreciation costs for a company vehicle that had already exceeded its useful life based upon STi's depreciation schedule, per FAR 31.205-11, DEPRECIATION (JUL 2006) (R4, tab 16 at G-228, 230). FAR 31.205-11(a) states that "[d]epreciation cost that would significantly reduce the book value of a tangible capital asset below its residual value is unallowable." For STi's claimed depreciation on a 2002 Cadillac ETS, a five-year depreciation schedule would have resulted in the auto's conclusion of its useful life before FY 2008 (R4, tab 8 at G-125; gov't supp. R4, tab G-15 at G-1009, 1011). STi previously agreed that these depreciation costs are unallowable (R4, tab 10 at G-172).

The COFD disallowed $68,675 in depreciation costs for FY 2008 and upwardly adjusted the FY 2009 depreciation costs by $25,307 because the costs were incorrectly assigned (R4, tab 16 at G-228, 230; tab 8 at G-125, 138). STI did not calculate the

10

depreciation costs according to its own depreciation schedule (R4, tab 8 at G-125; gov't supp. R4, tab G-15 at G-1008-13).  The adjustments reflect the requirements, per FAR 31.205-11, that depreciation costs must be assigned to the correct fiscal year.  STi previously agreed that these depreciation costs are unallowable (R4, tab 10 at G-172).

## II.  Disallowed Auto Expense

The final decision disallowed $11,633 in proposed G&A auto expenses for FY 2008 and $16,625 for FY 2009 because these costs were associated with personal use of company-furnished autos (R4, tab 16 at G-229, 231).  FAR 31.205-6(m)(2), COMPRENSATION FOR PERSONAL SERVICES (JUL 2005), states, "[t]hat portion of the cost of company-furnished automobiles that relates to personal use by employees (including transportation to and from work) is unallowable regardless of whether the cost is reported as taxable income to the employees."  FAR 31.205-13(b), EMPLOYEE MORALE, HEALTH, WELFARE, FOOD SERVICE, AND DORMITORY COSTS AND CREDITS (OCT 1995), states, "[c]osts of gifts are unallowable.  (Gifts do not include awards for performance made pursuant to 31.205-6(f) or awards made in recognition of employee achievements pursuant to an established contractor plan or policy.)."  During the course of the audit, STi provided DCAA two car titles for the auto expenses claimed; however, one of the cars was registered under a personal name, and not to the company (R4, tab 8 at G-128-29, 144; gov't supp. R4, tab G-15 at G-1007).  Although STi claimed this personally-titled vehicle was used solely for business purposes, STi was unable to provide any supporting documentation for the business usage for either fiscal year (R4, tab 8 at G-129).  Moreover, STi did not claim this vehicle for business use on its federal income tax returns for FYs 2008 and 2009 (R4, tab 8 at G-129; gov't supp. R4, tab G-15 at G-768, 790).

## III.  Disallowed Costs for Meals

For FY 2008, the COFD disallowed $14,878 for holiday party expenses, including alcohol, per FAR 31.201-14, ENTERTAINMENT COSTS (OCT 1995), and FAR 31.205-51, COSTS OF ALCOHOLIC BEVERAGES (APR 1986) (R4, tab 16 at G-229).  FAR 31.205-14 states, "[c]osts of amusement, diversions, social activities, and any directly associated costs such as tickets to shows or sports events, meals, lodging, rentals, transportation, and gratuities are unallowable."  FAR 31.205-51 additionally states, "[c]osts of alcoholic beverages are unallowable."  DCAA reviewed vendor invoices and receipts, along with expense vouchers (R4, tab 8 at G-130; gov't supp. R4, tab G15 at G-962-64, 979-86, 993-1000).  STi claimed costs in the amount of $91 for alcoholic beverages[3] and $14,787 for a Christmas party with alcohol; door prizes for the Christmas party; and an advance payment for a New Year's Eve office

---

[3] Notably, the charge was for two shots of Johnny Walker Blue Label Scotch at $35 each, plus tax and tip (gov't supp. R4, tab G-15 at G-980).

party (R4, tab 8 at G-130).  In its discovery responses, STi admitted that its FY 2008 ICP claimed entertainment and alcohol costs and that the FAR expressly disallows entertainment and alcohol costs (gov't supp. R4, tab G-6 at G-284).

For FY 2009, the COFD disallowed a total of $11,612 for unallowable meal costs included in the Rockville Overhead meals account (R4, tab 16 at G-230).  Of this amount, the final decision disallowed $4,951 per FAR 31.205-14 as unallowable entertainment costs, including a holiday party (*id*.).  DCAA reviewed the supporting documentation STi provided, including vendor invoices and receipts and expense vouchers (R4, tab 8 at G-137; gov't supp. R4, tab G-15 at G-947, 1150).  The $4,951 in unallowable costs as social activities pursuant to FAR 31.205-14 was comprised of three transactions in restaurants with non-detailed receipts as the only support for a total of $2,033, and one restaurant receipt in the amount of $2,917 that STi notated as "STI New Year Party" (R4, tab 8 at G-137; gov't supp. R4, tab G-15 at G-1014-18, 1150).  In its discovery responses, STi admitted that its FY 2009 ICP claimed entertainment costs and that the FAR expressly disallows entertainment costs (gov't supp. R4, tab G-6 at G-284).

The final decision disallowed an additional $6,661 in meal costs included in the Rockville Overhead meals account, per FAR 31.201-2(d), DETERMINING ALLOWABILITY (MAY 2004), because STi failed to provide any supporting documentation for three transactions (R4, tab 16 at G-230).  FAR 31.201-2(d) states,

> [a] contractor is responsible for accounting for costs appropriately and for maintaining records, including supporting documentation, adequate to demonstrate that costs claimed have been incurred, are allocable to the contract, and comply with applicable cost principles in this subpart and agency supplements.  The contracting officer may disallow all or part of a claimed cost that is inadequately supported.

The Government provided STi an opportunity to provide supporting documentation; however, STi was not able to provide any supporting documentation (R4, tab 8 at G-137).

In addition, for FY 2009, the final decision disallowed an additional $1,139 for meals included in STi's G&A meals account, per FAR 31.205-14, ENTERTAINMENT COSTS (OCT 1995), representing the cost of meals lacking supporting documentation for a business purpose and therefore considered for entertainment purposes (R4, tab 16 at G-232).  STi provided three non-detailed restaurant receipts without any support to demonstrate it incurred the costs for business development purposes (R4, tab 8 at G-145; gov't supp. R4, tab G-15 at G-970, 1001- 03).

12

IV. Disallowed Public Relations Costs for Rubik's Cubes

The final decision disallowed $5,251 in FY 2009 for the cost of Rubik's Cubes for entertainment and/or advertising purposes (R4, tab 16 at G-231-32). FAR 31.205-14, ENTERTAINMENT COSTS (OCT 1995), disallows entertainment costs and FAR 31.205-1(f)(6), PUBLIC RELATIONS AND ADVERTISING (AUG 2003), disallows public relations and advertising costs, including, "[c]osts of souvenirs, models, imprinted clothing, buttons, and other mementos provided to customers or the public." STi purchased 1,144 Rubik's Cubes without providing support to demonstrate a legitimate business use purpose (R4, tab 8 at G-145; gov't supp. R4, tab G-15 at G-970, 1004-05, 1152).

V. Rockville Overhead Labor

The final decision disallowed $93,422 in FY 2009 Rockville Overhead Labor per FAR 31.201-2(d), DETERMINING ALLOWABILITY (MAY 2004), because STi failed to provide supporting documentation to demonstrate these were STi labor costs (R4, tab 16 at G-230). Of this amount, $79,422 is attributable to non-employees (either outside employees or 1099-Miscellaneous Income individuals) that do not represent STi labor (R4, tab 8 at G-134-35; gov't supp. R4, tab G-15 at G-856-924). Despite Government requests, STi provided "no support for these Rockville Overhead labor transactions" (R4, tab 8 at G-135). The remaining $14,000 in disallowed costs represented an advance to an STi employee, for which STi failed to provide support (R4, tab 8 at G-135; gov't supp. R4, tab G-15 at G-921-24). These disallowances, when combined with an upward adjustment of $58,309 disallowed as a direct labor cost, resulted in a net disallowance of $35,113 to FY 2009 Rockville Overhead labor (R4, tab 8 at G-134-35).

VI. Irreconcilable Amounts

DCAA's audit report disclosed "significant irreconcilable amounts" in STi's FY 2008 and FY 2009 ICPs (R4, tab 8 at G-126). DCAA's "reconciliation disclosed numerous variances between the proposed account amounts and the general ledger amounts" and totaled the amounts within each indirect cost pool and allocation base and adjusted the amounts by cost center (*id.*). The contracting officer agreed and made the following adjustments for FY 2008: (1) an upward adjustment of $12,639 in the Overhead Pool; (2) an upward adjustment of $10,633 in the G&A Pool; and (3) a downward adjustment of $69,758 in the G&A Base due to irreconcilable differences

13

and a math error in STi's calculations (R4, tab 16 at G-228-29; tab 8 at G-126; gov't supp. R4, tab G-15 at G-823-34).

The final decision made the following adjustments for FY 2009: (1) a downward adjustment of $17,759 to the Rockville Overhead Pool; (2) an upward adjustment of $7,654 to the Norfolk Overhead Pool; and (3) a downward adjustment of $34,620 to the Rockville Overhead Base and a corresponding upward adjustment of $34,620 to the Norfolk Overhead Base because the direct labor costs, discussed above, were incorrectly assigned to the wrong location (R4, tab 16 at G-226-27, 231-32; tab 8 at G-126, 141, 155; gov't supp. R4, tab G-15 at G-823-34).

### VII. FY 2008 Overhead Pool Adjustment

The final decision made an upward adjustment in the amount of $12,639 to the FY 2008 Overhead Pool because STi failed to claim these costs in the Overhead Pool, as verified by the general ledger (R4, tab 16 at G-228; tab 8 at G-126; gov't supp. R4, tab G-15 at G-823-34).

### VIII. Overhead Applied to IR&D

The final decision disallowed $5,420 in excess overhead costs associated with IR&D labor costs resulting from the unilateral rate determination that reduced the FY 2008 overhead rate by 6.5% (R4, tab 16 at G-229; tab 8 at G-124, 130-31).

### IX. Intermediate Fringe

The final decision determined that STi overstated the FY 2009 Intermediate Fringe Benefit allocation base by $145,297, of which (1) $79,422 was attributable to STi's inclusion of non-employee services (discussed in Rockville Overhead labor above) and the cost of outside consultant labor in the base when fringe benefits do not apply to individuals who are not STi employees; and (2) $65,875 of the base should be properly reallocated from Rockville Labor to Other Direct Costs as outside services (discussed above in direct costs for consultants) (R4, tab 16 at G-229-30). STi "failed to provide any evidence that these were employees. Since these individuals are not STi employees, the cost of their services does not represent STi labor costs and fringe benefits do not apply to such costs" (R4, tab 16 at G-230; tab 8 at G-133, 152-58; gov't supp. R4, tab G-15 at G-1149).

### X. Rockville Overhead Applied Fringe

The final decision downwardly adjusted the FY 2009 Rockville Overhead pool by $32,141 for fringe costs (R4, tab 16 at G-231). This downward adjustment for fringe reflects the net amount of adjustments to associated questioned Rockville direct

14

labor costs ($225,925, discussed above) and Rockville Overhead labor ($35,113, discussed above), combined with an upward adjustment for all intermediate fringe costs of 0.88% over STi's proposed rate, resulting in a Fringe Benefit Rate of 23.40% (R4, tab 8 at G-134-36).

## XI. Rockville Overhead Allocation Base

The final decision reduced the FY 2009 Rockville Overhead base by $225,925 to reflect the disallowance of direct labor costs and certain irreconcilable amounts (R4, tab 16 at G-231). This total amount is based on: (1) a disallowance of $65,875 from direct labor because these are outside consultant costs; (2) a disallowance of $125,430 of executive labor costs from direct labor (and reallocation to indirect costs); and (3) a downward adjustment of $34,620 reflecting the costs that were reassigned to the Norfolk overhead pool. (R4, tab 8 at G-126, 138-39, 152-55; gov't supp. R4, tab G-15 at G-823-34, 856-927).

## XII. Norfolk Overhead Pool

The final decision upwardly adjusted the FY 2009 Norfolk Overhead Pool by $11,659 to reflect the net amount of adjustments to fringe costs based upon: (1) the increase to proposed Norfolk direct labor costs in the amount of $34,620; combined with (2) an upward adjustment for all intermediate fringe costs of 88% over STi's proposed rate, resulting in a Fringe Benefit Rate of 23.40% (R4, tab 16 at G-231; tab 8 at G-133-36, 140).

## XIII. FY 2009 G&A Base

The final decision made a downward adjustment to the G&A Base by $94,530, representing the following: (1) $67,121 reclassification of direct labor for STi President Mr. Chopra; (2) $17,304 reclassification of associated fringe for Mr. Chopra's labor costs (including the upward adjustment to 23.40%); and (3) $17,759 for correction of STi's reconciliation error in the Rockville Overhead account, combined with an upward adjustment of $7,654 under-reported amount in the Norfolk Overhead account (R4, tab 16 at G-231-32; tab 8 at G-143, 145; gov't supp. R4, tab G-15 at G-1019-20).

We find that each disallowance referenced above is supported by preponderant evidence.

## C. Assessed Penalties

FAR 52.242-3(d), PENALTIES FOR UNALLOWABLE COSTS (OCT 1995), prescribes:

If the Contracting Officer determines that a cost submitted by the Contractor in its proposal is expressly unallowable under a cost principle in the FAR, or an executive agency supplement to the FAR, that defines the allowability of specific selected costs, the Contractor shall be assessed a penalty equal to –

(1) The amount of the disallowed cost allocated to this contract; plus

(2) Simple interest . . .

The final decision determined STi included expressly unallowable costs totaling $78,741 for FY 2008 and $28,720 for FY 2009; after applying the covered contracts participation calculation and adding interest, the final decision determined STi owned $117,245 in penalties and interest (R4, tab 16 at G-234-35).

## I. FY 2008 Penalties

The final decision found that $52,230 in claimed costs in the overhead pool were subject to penalties (*id.* at G-234). Penalties were assessed for the inclusion of $50,544 per FAR 31.205-11(a) and 31.205-1(d) because STi included depreciation costs for an unallowable guest house used for entertainment (*id.* at G-233), and for the inclusion of $1,686 per FAR 31.205-11(a) because STi included depreciation costs for a vehicle that had exceeded its useful life based upon STi's depreciation schedule (*id.* at G-234).[4] These amounts were adjusted based on the government participation rate of 87.1%, resulting in a penalty of $45,493 (*id.* at G-234).

The final decision additionally held that $26,511 in claimed costs in the G&A pool were subject to penalties (*id.*). Penalties were assessed against the claimed costs in the amount of $11,633 per FAR 31.205-6(m)(2) because STi included auto costs for a personal-use vehicle (*id.*), and $14,878 per FAR 31.205-14, 31.205-51 because STi included expressly unallowable entertainment costs for holiday parties and alcohol (*id.*). The amount was adjusted by the 87.0% government participation rate in the G&A base for a penalty amount of $23,065 (*id.*).

## II. FY 2009 Penalties

The final decision found that $5,705 in claimed costs in the overhead pool were subject to penalties (*id.* at G-235). This amount included three transactions that represented costs incurred in restaurants with only a non-detailed receipt in support, including a transaction in the amount of $2,917 with the notation "STI New Year Party"

---

[4] Although the COFD identified this auto depreciation cost in the amount of $1,686 as unallowable in both FYs 2008 and 2009, the final decision did not assess the penalty for FY 2009.

(R4, tab 8 at G-137; gov't supp. R4, tab G-15 at G-1016) and a disallowed charge of $754 because STi included depreciation costs for an unallowable guest house used for entertainment (R4, tab 16 at G-235). The amounts subject to penalty were adjusted by the FY 2009 overhead participation rate of 82.1%, resulting in a penalty amount of $4,684 (*id.*).

The final decision found that $23,015 in claimed costs in the G&A pool were subject to penalty (*id.*). The final decision assessed penalties on $16,625 per FAR 31.205-6(m)(2) because STi included auto costs for a personal-use vehicle; $5,251 per FAR 31.205-14 because STi included costs for the purchase of Rubik's Cubes purchased for entertainment and/or advertising purposes; and $1,139 per FAR 31.205-14 because STi included unsupported meal costs deemed entertainment costs (*id.*). This amount subject to penalty was adjusted by the government's 81.8% participation rate in the G&A base for a total penalty of $18,826 (*id.*).

### III. Interest

The final decision determined that STi had been reimbursed for expressly unallowable costs and assessed interest pursuant to FAR 52.242-3(d)(2) (R4, tab 16 at G-235). The final decision assessed $19,687 in interest against the $68,558 penalty for FY 2008 (*id.* at G-234). The final decision assessed $5,490 against the $23,510 total penalty amount in FY 2009 (*id.* at G-236). This results in total penalties and interest of $117,245, and a total demand of $1,107,788 (*id.*). We find, based on the record, that the assessment of penalties and interest is reasonable and supported by a preponderance of evidence.

### V. STi's Appeal to the Board

STi timely appealed to the Board, where its appeal was docketed as ASBCA No. 61911. The appeal was initially set for a hearing; however, by motion dated September 29, 2020, the parties requested to proceed pursuant to Board Rule 11, and resolve the appeal on the record and without a hearing.

### DECISION

By request of the parties, this appeal is being decided pursuant to Board Rule 11, "Submission Without a Hearing." Unlike a motion for summary judgment, which must be adjudicated on the basis of a set of undisputed facts, pursuant to Board Rule 11, the Board may make findings of fact on disputed facts. *DG21, LLC*, ASBCA No. 57980, 15-1 BCA ¶ 36,016 at 175,909 n.1; *aff'd DG21*, *LLC v. Mabus*, 819 F.3d 1358 (Fed.

Cir. 2016); *Grumman Aerospace Corp.*, ASBCA No. 31585, 92-3 BCA ¶ 25,059 at 124,886 n.13 (Kienlen, J. dissenting).

## I. Legal Framework

STi's contract contained FAR 52.216-7, ALLOWABLE COST AND PAYMENT (DEC 2002), which requires contractors to submit an incurred cost proposal within six months of the end of the contractor's fiscal year, or by June 30, 2009 and 2010 for STi's 2008 and 2009 incurred cost proposals. The FAR provision expressly places the burden of submitting the ICP on the contractor. FAR 52.216-7(d)(2)(i) ("The Contractor shall submit an adequate final indirect cost rate proposal to the Contracting Officer . . . and auditor within the 6-month period following the expiration of each of its fiscal years").

STi asserts that the government's claim is barred by the statute of limitations (app. br. at 1). The Contract Disputes Act provides that a government claim against a contractor must be brought within six years of claim accrual. 41 U.S.C. § 7103(a)(4)(A). The CDA does not define claim accrual, so we look to the definition in the FAR. *See*, *Kellogg Brown & Root Services*, *Inc. v. Murphy*, 823 F.3d 622, 626 (Fed. Cir. 2016). The FAR defines claim accrual as:

> *Accrual of a claim* means the date when all events, that fix the alleged liability of either the Government or the contractor and permit assertion of the claim, were known or should have been known. For liability to be fixed, some injury must have occurred. However, monetary damages need not have been incurred.

FAR 33.201. The statute of limitations is an affirmative defense, and the burden is on STi to demonstrate that the government did not timely assert its claim. *Sikorsky Aircraft Corp. v. United States*, 773 F.3d 1315, 1320-22 (Fed. Cir. 2014). Thus, if the government was aware of its claim on or before November 30, 2012, the government's claim would be barred by the statute of limitations, subject of course to equitable tolling.

Board precedent holds that for flexibly priced contracts, such as STi's contract, we must conduct a fact-specific inquiry to determine when the government's claim has accrued. *Doubleshot, Inc.*, ASBCA No. 61691, 20-1 BCA ¶ 37,677 at 182,904. In some appeals the Board has found claim accrual upon submission of an invoice or voucher where that submission contained enough information to put the government on notice, while in other appeals, the Board has found that a claim did not accrue until the contractor submitted its incurred cost claim (*id.* at 182,904-05), or until after the contractor provided its general ledger to auditors reviewing an incurred cost proposal.

18

*Coherent Logix, Inc.*, ASBCA No. 59725, 15-1 BCA ¶ 35,947 at 175,678. The key to a fact-specific inquiry is whether the government had sufficient information to know of the claim, but the claim accrual is not suspended to allow the government time to perform an audit or to appreciate the significance of the information it already has. *Doubleshot*, 20-1 BCA ¶ 37,677 at 182,905 (citing *Raytheon Missile Systems*, ASBCA No. 58011, 13 BCA ¶ 35,241 at 173,018). The Board additionally has held that a claim that unilaterally establishes indirect cost rates legally cannot be brought before submission of the incurred cost proposal. *Technology Systems*, *Inc.*, ASBCA No. 59577, 17-1 BCA ¶ 36,631 at 178,389.

II.  The Government's Claim Was Timely Filed

A.  STi Has Not Demonstrated That It Submitted Its ICP Prior to 2014

As addressed in the findings of fact, we hold that STi has not established by a preponderance of the evidence that it submitted its 2008 and 2009 ICPs in July 2009 and July 2010, respectively. While STi demonstrated that it timely prepared the ICPs, it did not establish that the ICPs were submitted to the government. At best, STi presented testimony that the president of STi and the office manager thought that the ICPs had been submitted. However, STi did not maintain an outgoing mail log, and did not present a shipping receipt, waybill, or other evidence that the ICPs were sent to the DCAA auditor, as the office manager believed to be the case.

We additionally held that the government has established by a preponderance of the evidence that it did not receive STi's incurred cost proposals until July 11, 2014. The relevant government agencies maintained incoming mail logs and electronic records systems and found no evidence of receipt of STi's 2008 and 2009 ICPs. STi has not presented any evidence by an individual with personal knowledge that the ICPs were mailed or otherwise delivered to the government. To the extent STi is questioning the reliability of the mail log information based upon the fact that DCMA was unable to identify the assigned administrative contracting officer responsible for STi's contract during the relevant period (app. reply. at 3, 6, 10-11, 26-27, 29), this is irrelevant based on STi's own testimony that it sent its ICP's to the DCAA auditor, and not to the contracting officer (app. supp. R4, tab A-30 at A-1097, tab A-31 at A-1101-02).

B.  The Government Did Not Have A Duty To Determine Whether STi Had Submitted Its ICP

STi additionally argues that, even if we find that it did not timely submit its ICP's, that the government's claim is still barred by the statute of limitations because the government should have known that STi's ICPs were overdue and had a duty to request the ICPs from STi (app. br. at 21-37). According to STi, the government was on notice that the ICP's had not been submitted, and thus had knowledge of its claim

19

at that time (app. br. at 22). As noted above, we look to see when the government had sufficient information to know about its claim. *Doubleshot*, 20-1 BCA ¶ 37,677 at 182,905. Here, the government's claim questions direct costs, indirect costs, sets unilateral rates, and asserts penalties and interest (R4, tab 16). As a matter of law, the unilateral rates could not have been set until after STi submitted its ICP's, which occurred, as we found above, in July 2014. *Technology Systems*, 17-1 BCA ¶ 36,631 at 178,389. Hypothetically, the government could have been aware of some of the questioned direct costs if they were included on a voucher. However, there is no evidence in the record that STi had submitted evidence to put the government on notice of the impermissible direct costs to the government before submission of the ICPs. Instead, STi attempts to create a rule that the statute of limitations begins to run on the due date of the incurred cost proposal, whether the contractor submits an incurred cost proposal or not (app. reply at 7) ("Under the definition of claim accrual, STi need only establish that the Government *should have known* facts that would permit it to assert its claim against STi" (emphasis in original)). This argument is clearly contrary to our precedent holding that the events necessary to fix the government's liability do not occur until the contractor submits the incurred cost proposal and makes available sufficient audit records. *Doubleshot*, 20-1 BCA ¶ 37,677 at 182,905.

STi additionally attempts to shift its responsibility to submit an ICP to government, arguing that the "Government is responsible for receiving a final indirect cost rate proposal within six months of the end of the contractor's fiscal year . . . ." (app. br. at 22). As noted above, the FAR provides that the contractor "shall" submit its ICP FAR 52.216-7(d)(2)(i). We reject STi's attempt to shift its burden to the government. Like the contractor in *Doubleshot*, STi "cannot fail to comply with its contractual duties, while at the same time contending that the statute is running on the government's claim." *Doubleshot*, 20-1 BCA ¶ 37, 677 at 182,905.

STi also alleges that internal DCMA procedures require the contracting officer to ensure that contractors submit their ICPs (app. br. at 26 n.4). However, the cited guidance from a DCMA manual is not incorporated into the contract, which explicitly places the burden on STi to submit its ICPs. FAR 52.216-7(d)(2)(i).

### III. The Government Has Supported Its Claim for Unallowable Costs and Penalties

The details of the government's affirmative claim are set-forth in the findings of fact and need not be repeated here. STi has not challenged any elements of the claim.[5]

---

[5] Count II of STi's complaint alleged that DCAA failed to take into account STi's cash-basis accounting and included in the questioned costs amounts for services rendered in 2009 but billed in 2010 (compl. ¶¶ 45-57). STi did not present this

Nevertheless, we have reviewed the government claim and the supporting documentation contained in the record. We found that each questioned direct and indirect cost to be unallowable pursuant to the cited FAR regulations and each disallowance to be supported by preponderant evidence. Additionally, we found the contracting officer's determination of expressly unallowable costs to be supported by preponderant evidence. We conclude that the contracting officer's assessment of penalties for the inclusion of expressly unallowable costs and the assessment of interest on those penalties to be in accordance with law and supported by preponderant evidence. Accordingly, we sustain the government claim in its entirety.

## CONCLUSION

For the reasons stated above, STi's appeal is denied. The government claim in the amount of $1,107,788 is sustained.

Dated: January 5, 2022

DAVID D'ALESSANDRIS
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

---

argument in its Rule 11 briefing and it has been waived. *States Roofing Corp.*, ASBCA No. 54860 *et al.*, 10-1 BCA ¶ 34,356 at 169,664.

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 61911, Appeal of Strategic Technology Institute, Inc., rendered in conformance with the Board's Charter.

Dated:  January 6, 2022

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals